FILED

UNITED STATES DISTRICT COURT  2018 MAY 21  PM 12: 52

MIDDLE DISTRICT OF FLORIDA

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

| | |
|---|---|
| THE ESTATE OF JAMES HART; PRECIOUS HART AND LAVERNE HART, BOTH INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JAMES HART, DECEASED; JAVONTA EDVARIS HART, <br><br>Plaintiffs,<br><br>vs.<br><br>ALLERGAN, INC., a California Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>2:18-cv-353-FtM-29CM |

Plaintiffs THE ESTATE OF JAMES HART ("the Estate"); PRECIOUS HART and LAVERNE HART, both individually and on behalf of the ESTATE of JAMES HART, deceased; JAVONTA EDVARIS HART (collectively, "Plaintiffs"), allege the following causes of action and damages against Defendants ALLERGAN, INC., a California Corporation and Does 1-100, inclusive ("Allergan") or ("Defendants"), as follows:

## I. INTRODUCTION

1. Plaintiffs bring this action against Defendants, including prescription drug manufacturer ALLERGAN to recover damages for the catastrophic, and untimely wrongful death of a 59 year-old male, James Hart, deceased. James Hart was administered ALLERGAN's branded prescription drug Infed, on May 22, 2014 at Florida Cancer Specialists in Fort Myers, Florida, resulting in his death on August 3, 2014 from Stevens-Johnson syndrome ("SJS") and toxic epidermal necrolysis ("TEN"). These adverse drug reactions caused i) severe and painful

skin sloughing and defoliation over the majority of his body; ii) significant and permanent obliteration and scarring to his eyes, eyelids, and to 100% of his skin surface; iii) permanent disfigurement and scarring to his body, including his eyes and lungs; iv) pulmonary and ocular damage; v) severe emotional and psychological injuries; and vi) ultimately, his death. All of the aforementioned injuries were the direct result of the administration of ALLERGAN's branded prescription drug Infed. James Hart's death from the severe and permanent physical, psychological and emotional injuries were the direct and proximate result of Defendants' wrongful conduct in connection with the design, manufacture, sale, testing, marketing, advertising, promotion, sale and/or distribution of its prescription drug Infed.

## II. PARTIES

2. Plaintiffs are individuals who are both the full age of majority and residents and citizens of the City of Clewiston, the County of Hendry and the State of Florida. The Estate is being administered in Hendry County, Florida.

3. ALLERGAN is a California corporation with its principal office located at 2525 Dupont Drive, Irvine, California, 92623-9534. As used herein, the term "ALLERGAN" includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers and organizational units of any kind, their predecessors, successors and assigns and their present officers, directors, employees, agents, representatives and other persons acting on their behalf. Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of ALLERGAN was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification and authorization of the defendant and its directors, officers and/or managing agents.

### III. JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332.

5.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Plaintiff resides in this District and Defendants are subject to personal jurisdiction in this District. Defendants directly, and through its agents, has substantial contacts with and receives benefits and income from and through Hendry County, Florida and its environs.

### IV.     Statement of Facts

6.     This case involves ALLERGAN's branded prescription drug Infed. At all times material to this action, Defendants packaged, distributed, supplied, and sold Infed by placing the drug into the stream of commerce in the State of Florida, and labeled, described, marketed, advertised, promoted and purported to warn or to inform users regarding the risks pertaining to Infed. ALLERGAN was engaged in the business of researching, designing, developing, licensing, compounding, testing, producing, manufacturing, assembling, processing, packaging, inspecting, labeling, selling and/or warranting Infed including to Florida Cancer Specialists and subsequently to James Hart.

7.     On or about May 22, 2014 James Hart presented to Florida Cancer Specialists for treatment of anemia and renal insufficiency. There was no rash or mucosal blisters that were noted at this time when his physician ordered Infed for James Hart to replenish his iron deficiency.

8.     Immediately upon and after receiving the Infed infusion, James Hart felt as if his entire inside was on fire. These symptoms continued to persist and his personal care physician

Dr. Hans Michel Louis-Charles, MD explained to James Hart that this was an immediate allergic reaction to the infusion and was prescribed Prednisone, Pepcid and Benadryl to counteract the side effects. James Hart started developing mucocutaneous lesions (i.e., blisters on mucosal surfaces, including eyes, mouth, lips, lungs, GI tract, etc.) as well as skin lesions that were spreading to his chest and bilateral upper extremities. A physical exam revealed that he had bilateral conjunctivitis, mucocutaneous lesions on the lips, and white plaque on the tongue. A skin exam revealed that he had approximately 20% total body surface area of skin sloughing over the neck, bilateral upper extremities, chest, genitalia, and his right cheek. James Hart was diagnosed with SJS that was progressing into TEN greater than 30% TBSA that was, in the opinion of the dermatologist, probably unrelated to admission symptoms, including fever. During his hospital stay, James Hart sloughed off 30% or more of his skin, leaving him in excruciating pain that required surgeries and debridements as the burn unit took him to the tank to pick the dead skin off his body and to treat it with wound care dressings. James Hart died on August 3, 2014.

### The Number of SJS/TEN Reports Has Increased Between 2005-2010

9. Below are key excerpts taken from either peer-reviewed papers and FDA, and other scientific reviews of literature, and reviews of spontaneous reports from FDA, and from different sources around the world that evidence a striking increase in reporting rates, and higher risks to subpopulations after 2005.

10. For example, the FDA Response in 2006 to the Ibuprofen SJS and TEN Citizen's Petition-only mentioned 88 reports with 49 possibly related for review, see below excerpt taken from FDA response dated in 2006:

> reported TEN. There was no noticeable trend over the years in reporting of adverse

11. However, by 9/2005, ALLERGAN knew of numerous reports of SJS and TEN in their own database and would be in addition to those in the FDA database from other manufacturers. A search of the FDA AERs database and reported there were 295 non-duplicate reports of SJS and TEN, yet, this was not assessed along with the other safety data by Defendants, and reported in a comprehensive risk assessment by Defendants, even though several safety signals existed that were ignored by Defendants.

Table 6. Drugs commonly used but probably not associated with SJS/TEN identified by EuroSCAR and corresponding relative reporting frequency data in FDA AERS

| Generic name | Number of SJS/TEN | EB05 | LR05 | Total adverse event reports for drug |
|---|---|---|---|---|
| Acetaminophen | 313 | 2.93 | 1.4 | 20039 |
| Amlodipine | 106 | 1.041 | | 20862 |
| Aspirin | 213 | 2.684 | 0.82 | 16518 |
| Captopril | 89 | 2.375 | 1.5 | 8106 |
| Enalapril | 69 | 1.031 | | 14450 |
| Furosemide | 451 | 8.578 | 1.3 | 11303 |
| Glimepiride | 18 | 1.307 | | 1986 |
| Glyburide | 65 | 2.145 | 1.049 | 6407 |
| Hydrochlorothiazide | 44 | 1.69 | | 4822 |
| Ibuprofen | 295 | 2.119 | 1.4 | 25278 |
| Insulin | 24 | 0.885 | | 4493 |
| Ketoprofen | 38 | 1.954 | | 3619 |
| Metoprolol | 52 | 1.225 | | 7958 |
| Naproxen | 71 | 0.507 | | 30173 |
| Nifedipine | 90 | 2.648 | 1.5 | 7117 |
| Ramipril | 49 | 1.845 | | 4934 |
| Valproic acid | 184 | 1.298 | | 26557 |

12. Defendants should have revised their labeling to reflect the current knowledge of the risks of SJS/TEN: the increased risks of death, and the increased risks of SJS/TEN to children; and the increased risks of SJS/TEN to females; and the increased risk of SJS/TEN to African Americans; and the increased risks of serious ocular outcomes; that the consumption of Infed could result in the severe consequences of SJS/TEN; information regarding the degree of risk of SJS/TEN; the possible consequences of SJS/TEN such as blindness, massive loss of skin and scarring, damage to bodily organs, burns over large portions of the body and permanent disability and injuries.

13. Defendants knew or should have known that Infed carries increased risks of SJS/TEN for certain subpopulations, has increased risks of mortality and morbidity, and has an

increased reporting rates for SJS/TEN, all of which represent a clear and strong safety signal that Defendants ignored for many years. Defendants failed to adequately warn the FDA, healthcare providers, physicians and consumers of the risk of SJS and TEN. These failures were a proximate cause of James Hart's SJS/TEN reaction, in part, based on the following:

- Defendants failed to comprehensively review, assess and report to the FDA the adverse experience reports involving serious skin reactions;
- Defendants failed to comprehensively review and submit, and assess the scientific literature to the FDA as required by the postmarketing reporting regulations;
- Defendants knew that 21 C.F.R. 201.56-57 for their prescription products, and 201.66 for their OTC products required the disclosure of serious adverse events that can be fatal;
- Defendants did not submit warnings specific to the information contained in the scientific literature to ensure that physicians had the essential scientific information for the safe and effective use of Infed;
- Defendants failed to assess and submit substantial and important literature over the course of many years while they marketed Infed products;
- Defendants failed to communicate the results of many scientific studies reported in literature like that impacted the risk-benefit profile of Infed products to the medical and patient community;
- Defendants failed to advise the medical community and the public that safer alternatives to Infed, and that they need not unnecessarily incur the risk of blindness, corneal melting, symblephara (fusion of the eyeball to the eyelid), ocular lesions, lung injury, coma, and multiple surgeries when some other products were equally effective and far less disabling and deadly alternatives;
- Defendants failed to study whether the benefits of Infed outweigh its risks in relation to safer alternative medications for the same indications, including labeling comprehension studies to evaluate the effectiveness of the current serious skin reaction information and warnings; and
- Defendants have never conducted any labeling comprehension research to even prove that the existing labeling is effective at all to warn, or provide adequate directions for use, or to guide users on the appropriate selection of Infed with the known increased risks for subpopulations, or whether the *Soller* warnings are not effective.

14. SJS/TEN is a very serious disease that carries a significant risk of death. Survival is predicated on early diagnosis and aggressive and appropriate treatment by skilled healthcare

providers with specialized experience in treating this condition. The majority of the patients survive suffer lifelong and permanent injuries as a result. The earlier the disease is recognized, diagnosed and properly treated, the better the chances the patient has of survival, and the better the chances the patient has to stop the progression of the disease and resulting injuries.

15. Given that Infed has been scientifically established to cause SJS/TEN, it is crucial that the physicians and consumers, especially high-risk patients including females, African Americans and children, be provided with adequate information and specific warnings regarding the increased risks of SJS/TEN, along with specific information about the degree of risks, the timing of the risks in relation to the use of therapy, and the at-risk population whose use should be restricted due to the increased risks of SJS/TEN associated with ibuprofen products. At the time Infed was administered to James Hart, it did not (and to this day does not) contain adequate warnings regarding the various risk information or adequate directions of use for Infed and its unique risks of SJS/TEN, especially the failure to disclose the risk of death, or increased risk in various subpopulations, including females, pediatric population, or the African-American patient population.

16. Defendants did not provide a consumer leaflet to U.S. consumers with additional warnings regarding serious skin reactions and the at-risk populations who have a higher risk of serious skin reactions to Infed, like Defendants do in foreign countries when they could have done so without prior FDA approval.

17. Despite having knowledge of the causal relationship and the increased magnitude of the risks of SJS/TEN with the use of Infed through the published literature, Defendants knowingly failed to update or strengthen Infed's package insert to reflect these increased risks

for females, African Americans and children, which are confirmed in scientific papers published in part by their own experts.

18.     As a direct and proximate result of Defendants' wrongful conduct as described herein, James Hart and his family's lives were tragically altered forever by his early death, but not before decedent suffered permanent harm and disfigurement, extreme physical pain, scarring all over his body, blindness in both eyes, and the attendant pain, suffering and emotional trauma to decedent prior to death, and his family watching directly of him suffering and then dying right before their eyes. The loss of their son has caused extensive suffering and severe emotional distress, and economic damages through the expense of substantial sums of money for medical, hospital, and related care, and caused additional financial harm to Plaintiffs for the rest of their lives.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY/FAILURE TO WARN

19.     Plaintiffs incorporate by reference paragraphs 1-18 of this Complaint as if set forth in full.

20.     Defendants designed, tested, manufactured, marketed, distributed and supplied Infed. As such, Defendants had a duty to adequately test the product in conformance with the standards of care to ensure that the risks and benefits of the drug were sufficient for the safe and effective use of the drug for its approved indications, and to warn healthcare providers, including hospitals, clinics, prescribers, and patients, consumers, including decedent James Hart, of the health risks and dangers associated with using the medication, both in the premarketing and post-approval lifecycle phases of Infed.

21. Infed was in the exclusive control of Defendants, and was sold without adequate directions of use and without adequate warnings regarding the risk of SJS, TEN and other risks associated with its use.

22. As a direct and proximate result of the defective condition of Infed, as tested, designed, manufactured, marketed and/or supplied by Defendants, Defendants' failure to adequately warn of known risks, and Defendants' negligence, gross negligence, recklessness, and/or willful misconduct in connection with those acts and omissions, Plaintiffs suffered personal injury, damages and economic loss as alleged herein.

23. Defendants knew of the defective nature of Infed, but continued to design, test, manufacture, market, and sell the medication to maximize sales and profits at the expense of public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by the medication, and in violation of their duty to provide an accurate, adequate, and complete directions for use and warnings concerning the use of Infed.

24. Defendants failed to warn the public, including Plaintiffs and decedent James Hart of the dangerous propensities of Infed, which were known or should have been known to Defendants, as they were scientifically readily available. Specifically, Defendants failed to warn in the following respects:

- Failing to disclose, and/or intentionally concealing, the results of tests showing the potential risks of serious skin reactions, erythema multiforme exudativum (EM), bullous fixed drug eruption (BDFE), severe cutaneous adverse reaction, acute generalized exanthematous pustulosis (AGEP), drug reaction with eosinophilia and systemic symptoms (DRESS), exfoliative dermatitis, SJS, TEN, and other injuries associated with the use of Defendants' product Infed during the premarketing and post-approval phases of the lifecycle of the drug product Infed;

- Failing to include adequate warnings with Defendants' product Infed about the potential and actual risks and the nature, scope, severity, frequency and duration of serious adverse effects of Defendants' product Infed;

- Concealing and/or providing false or inaccurate information regarding the known risks of serious skin reactions, exfoliative dermatitis, SJS, TEN, and other risks associated with Defendants' product Infed;

- Concealing the known incidents of serious skin reactions, exfoliative dermatitis, SJS, TEN and other injuries, and the mortality and morbidity rates, at risk populations, and postmarketing experience, and early symptoms of SJS/TEN, and the need for greater care and monitoring during first 8 weeks of therapy;

- Concealing and failing to alert potential users of Infed, including Plaintiffs, of the increased risk of SJS/TEN to African Americans and children as well as the increased severity of injuries or worse outcomes to African Americans and children as a result of SJS/TEN attributable to Infed;

- Concealing information from consumers regarding the frequency of all clinically significant adverse reactions and the approximate mortality and morbidity rates for patients experiencing the reaction;

- Concealing the risk of SCAR events was significantly higher in the first weeks of product use, including failing to place that information in the Infed label;

- Concealing information regarding the full disclosure of the early warning signs for SJS/TEN and failing to warn that stopping Infed's use immediately can reduce the severity of injury or mortality;

- Failing to monitor and review the scientific and medical literature relevant to Infed, even though federal law and common law duties of ordinary care and prudence require such monitoring; and

- Fraudulently omitting and concealing stronger warnings for Infed and Ibuprofen products marketed by Defendants in foreign countries that have stronger warnings for SCAR.

25. Defendants knew and intended for Infed to be used by persons without any inspection for defects. Defendants also knew that hospitals, clinics, physicians, insurance companies, pharmacies, and patients such as decedent James Hart would rely upon the representations and disclosures made by Defendants in their dossiers, and on the product labels and Medication Guides, and in other promotion and sales materials upon which Plaintiffs and decedent James Hart relied.

26.     Plaintiffs and decedent James Hart reviewed and relied on the entire Infed label prior to being administered the product. Plaintiffs and decedent James Hart's review of the Infed label included, but was not limited to the uses and warnings sections, including the adverse reactions listed therein. Among other stronger potential warnings, had Defendants warned Plaintiffs and decedent James Hart of the serious risks of life-threatening skin reactions including SJS/TEN reactions; that death, disability, such as blindness, or hospitalizations can occur; warned of all of the early signs of a serious cutaneous adverse reaction (SCAR) event that James Hart experienced, including fever, conjunctivitis and malaise, among other warning signs of the early onset of SJS and TEN; or warned that death, as suffered by James Hart, then James Hart would not have taken Infed. To be clear, an accurate, stronger, better and not misleading and incomplete warning (including but not limited to the terms contained in the preceding sentence) would have prevented James Hart from taking Infed and suffering catastrophic injuries and death. The misrepresentations and omissions regarding the safety profile of Infed (as set forth above) omitted those critical safety facts from the product label; Defendants' failures to distribute consumer health updates and warning outside of the product label (as set forth in Plaintiff's fraud count below); and Defendants' misleading and incomplete advertising and promotion relating to the purported safe and effective qualities of the product caused James Hart to use Infed. Because the Infed label was misleading in the ways stated above and herein (including but not limited to an incomplete disclosure of the risk of injury and misleading nature of understatement of the side effects of Defendants' drug), Plaintiffs and decedent James Hart relied on the language in the Infed label and ingested Infed, to decedent James Hart's detriment and permanent disabling injury, including premature death.

27. As a direct and proximate result of Defendants' sale of Infed without adequate directions of use and adequate warnings regarding the risk of SJS, TEN and other risks associated with its use, Plaintiffs and decedent James Hart suffered harm, including wrongful death, as alleged herein, and including ascertainable economic loss, including out-of-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to James Hart's being administered Infed, as well as extreme pain and suffering, loss of enjoyment of life, and other substantial damages.

## SECOND CAUSE OF ACTION

## DEFECTIVE DESIGN

28. Plaintiffs incorporate by reference paragraphs 1-18 of this Complaint as if set forth in full.

29. Defendants were the designers, testers, manufacturers, sellers, distributors, marketers, and/or suppliers of Defendants' product Infed, which was defective and unreasonably dangerous to consumers.

30. Defendants' product Infed was sold, distributed, supplied, manufactured, marketed, and/or promoted by Defendants, and was expected to reach and did reach consumers without substantial change in the condition in which it was manufactured and sold by Defendants.

31. The product Infed manufactured, supplied, and/or sold by Defendants was defective in design or formulation in that when it left the hands of the manufacturers and/or sellers and was unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation. Plaintiffs intend to seek discovery with regard to whether a defect occurred during the manufacturing process.

32. Defendants knew of Infed's defective nature but continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their product.

33. There were safer alternative methods and designs for the product. Specifically, Defendants knew that technologically safer products were available which have a lower risk for SJS and TEN compared to the formulation of Defendants' Infed. There were other designs that would not impact the utility of the product, and that would lower the risks of SJS/TEN, and other skin reactions that Defendants could have utilized to submit for approval to treat the same condition that were scientifically available and feasible, and would not render the product defective. But Defendants failed to do so.

34. At all times material, Infed was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following:

   a. When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including James Hart, to risks which exceeded the benefits of the drug;

   b. Defendants did not adhere with minimum standards of care for the pharmaceutical industry;

   c. The drug caused harmful side effects that outweighed any potential utility;

   d. The drug was not accompanied by adequate labeling, directions/instructions for use and/or warnings to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including James Hart, of the potential risks and serious side effects associated with its use; and

   e. In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential and actual risk of

harm would have concluded that Infed should not have been marketed in that condition.

35. At all times material, the drug Infed was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed, it was expected to reach, and did reach, users and/or consumers of the drug across the United Sates, including James Hart, without substantial change in the defective and unreasonably dangerous condition in which it was sold.

36. James Hart used Infed for its intended or reasonably foreseeable purpose. As a direct, legally proximate and producing result of the defective and unreasonably dangerous condition of Infed, Plaintiffs and James Hart have sustained harm, including severe personal injuries, blindness and death, among other things, for which Plaintiffs are entitled to damages. These injuries have caused extensive pain and suffering, severe emotional distress to Plaintiffs, and caused Plaintiffs and decedent James Hart to expend substantial sums of money for medical, hospital and related care.

37. As a direct and proximate result of the design and manufacturing defects of Defendants' product Infed, Plaintiffs and James Hart suffered injury and harm as previously alleged herein, including ascertainable economic loss, including the purchase price of Defendants' product Infed, out-of-pocket costs of medical tests and treatment, future medical care and/or services, and other costs incidental to James Hart's ingestion of harmful and defective products, as well as extreme pain and suffering, loss of enjoyment of life, premature death and other injuries and damages.

38. Defendants' aforementioned conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Plaintiffs and James Hart,

including Defendants' knowingly withholding and/or misrepresenting information to the public including Plaintiffs and James Hart, which information was material and relevant to the harm in question.

### THIRD CAUSE OF ACTION

### FALSE, MISLEADING, UNFAIR, DECEPTIVE AND UNCONSCIONABLE ADVERTISING IN VIOLATION OF DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (CHAPTER 501.201, ET. SEQ.)

39. Plaintiffs incorporate by reference paragraphs 1-18 of this Complaint as if set forth in full.

40. This cause of action is brought pursuant to Florida Deceptive and Unfair Trade Practices Act (Chapter 501.201, et. seq.) for false, misleading, unfair, deceptive and unconscionable advertising against Defendants.

41. Defendants have engaged in a scheme of offering for sale Infed to Plaintiffs and James Hart other members by way of, *inter alia*, product packaging and labeling, commercial advertisements, and other promotional materials.

42. Said labeling and other representations were made within the State of Florida and come within the definition of advertising as contained in Florida Deceptive and Unfair Trade Practices Act (Chapter 501.201, et. seq.), *et seq.*, in that such promotional materials and product labeling are intended as inducements to purchase the products and are statements disseminated by Defendants to Plaintiffs and James Hart and are intended to reach these consumers.

43. Defendants knew, or in the exercise of reasonable care should have known, that these statements would be misleading and deceptive to the reasonable Florida consumer.

44. In furtherance of said plan and scheme, Defendants manufactured and distributed, within the State of Florida, product packaging and labeling, commercial advertisements and other promotional materials containing statements that falsely advertise the true nature of Infed.

45. Consumers, including Plaintiffs and James Hart, necessarily and reasonably relied on the label and other marketing materials for these products.

46. Consumers, including Plaintiffs and James Hart, were among the intended targets of these representations and statements.

47. The above acts of Defendants, in disseminating said misleading and deceptive representations and statements throughout the State of Florida to consumers, including Plaintiff and James Hart, were and are likely to deceive reasonable consumers, by obfuscating the nature of the ingredients of Infed, all in violation of the "misleading prong" of Florida Deceptive and Unfair Trade Practices Act (Chapter 501.201, et. seq.), *et seq.*

48. As a result of the above violations of the misleading prong of Florida Deceptive and Unfair Trade Practices Act (Chapter 501.201, et. seq.), *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiff and James Hart.

49. Plaintiffs and James Hart, pursuant to Florida Deceptive and Unfair Trade Practices Act (Chapter 501.211, et. seq.), *et seq.*, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore to any person in interest any money paid for Infed as a result of the wrongful conduct of Defendants.

WHEREFORE,

As a direct and proximate cause of James Hart's ingestion and use of Defendants' product Infed, Plaintiffs and James Hart sustained the following damages and seek recovery from all Defendants for the following damages:

    a.    Physical and mental pain and suffering, in the past and in the foreseeable future;

    b.    Physical impairment, disability and disfigurement, in the past and in the foreseeable future;

    c.    Past and future mental anguish, in the past and in the foreseeable future;

    d.    Mental pain and suffering, in the past and in the foreseeable future;

    e.    Past medical expenses, in the past and in the foreseeable future;

    f.    Loss of enjoyment of life, in the past and in the foreseeable future;

    g.    Past and future lost wages;

    h.    Loss of consortium in the past and future; and

    i.    All available wrongful death and survivorship damages stemming from James Hart's ingestion of Infed and subsequent death.

    j.    Punitive or exemplary damages.

    k.    Awarding all actual and compensatory damages to Plaintiffs in amount to be determined at trial;

    l.    For a preliminary and permanent injunction enjoining Defendant from advertising, representing, or otherwise holding out for sale within the State of Florida, that Infed is safe for use by consumers including James Hart;

    m.    An Order requiring Defendants to provide corrective advertising designed to correct the misrepresentations, misstatements and omissions made in the marketing, advertising, packaging and other promotional materials related to Infed.

n.  For a judgment of the Court to restore, by way of restitution, refund or reimbursement, to any person in interest, any money acquired by means of Defendants' unjust enrichment;

o.  For a judgment of the Court to restore, by way of restitution, refund or reimbursement, to any person in interest, any money acquired by means of Defendants' untrue, deceptive or misleading advertising and/or unfair, unlawful or fraudulent business acts and practices described herein;

p.  Disgorgement of the excessive and ill-gotten monies obtained by Defendants as a result of the untrue and misleading advertising and unlawful, unfair, or fraudulent business acts and practices described herein;

q.  For pre-judgment interest from the date of filing this suit;

r.  Any and all reasonable attorneys' fees and costs pursuant to Section 501.2105, Fla. Stat;

s.  Awarding the costs and expenses of litigation to Plaintiffs; and

t.  Such further relief as this Court deems necessary, proper and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

| | |
|---|---|
| DATED: May 18, 2018 | **KOPELOWITZ OSTROW**<br>**FERGUSON WEISELBERG GILBERT**<br>*/s/ Jeff Ostrow*<br>Jeff Ostrow, Esq.<br>Florida Bar No. 121452<br>ostrow@kolawyers.com<br>Scott A. Edelsberg, Esq.<br>Florida Bar No. 100537<br>edelsberg@kolawyers.com<br>Joshua Levine, Esq.<br>Florida Bar No. 91807<br>levine@kolawyers.com<br>1 W. Las Olas Blvd., Suite 500<br>Fort Lauderdale, Florida 33301<br>Telephone: (954) 525-4100<br>Facsimile: (954) 525-4300<br><br>**LAW OFFICES OF WAYNE KREGER**<br><br>By: *Wayne S. Kreger*<br>Wayne S. Kreger, Esq.<br>The Law Offices of Wayne Kreger<br>303 Fifth Avenue, Suite 1201<br>New York, New York 10016<br>(212) 956-2136 tel<br>(212) 956-2137 fax<br>wayne@kregerlaw.com<br>*(Pro Hac Vice to be filed)* |